United States v. Kehoe. Good morning, Your Honors, and may it please the Court. I'm Caroline Platt on behalf of Edward Kehoe. The police lacked reasonable suspicion to support the warrantless seizure of Mr. Kehoe's purse. Can you put the microphone a little closer so we can be sure and hear you. Sorry, Your Honor. They lacked reasonable suspicion to support the warrantless seizure of Mr. Kehoe's person, first because the tips that they relied upon were insufficiently reliable, and second because the assertion of illegality of criminal behavior within those tips was entirely uncorroborated by the police officers once they got to the RJ's Sports Bar, the establishment, on the night in question. The Supreme Court and its decision in J.L. distinguished between tips that are reliable merely in identifying a determinate person, in J.L. there's a young black man at a bus stop, and those that are reliable in asserting illegality as in asserting criminal behavior. So in J.L. the police confirmed that that person was at that place, but that was not enough to provide reasonable suspicion. That's the same thing that happened here. There was a white man in a blue and white striped shirt in the billiards room of this bar, but the police never corroborated the illegal behavior asserted, and that's why there was not reasonable suspicion when they seized his person. Which was carrying the gun? Actually, Your Honor, it's not just carrying a gun because we're in Virginia. The criminal behavior here was carrying a concealed weapon on the premises while armed. You have to consume alcohol while you're armed at the bar. It's not just having the weapon, because having a weapon at a bar is potentially legal in Virginia. So if he just had the weapon in the bar, that's not illegal? Correct, Your Honor. So under the statute, and in fact the government agrees with this on page 22 of the red brief, you can be armed in a bar in Virginia as long as you do not consume alcohol in the bar while you're armed. And so the police had to corroborate not just that Mr. Kehoe was there and potentially armed. When they observed the defendant, they observed a slurred speech. So on page 54 of the joint appendix, the officer says that his speech was slightly slurred. However, as you can see in the video, as you have seen in the video, the bar was very loud, and it's not clear on the video that his speech was slurred, and even if it was, I don't think that that's enough. I mean, he could have had a southern accent, for example, which might sound slightly slurred. Wasn't there a lack of balance? There's not, Your Honor. If you watch the video, when he stood, he was perfectly still, and the police allege that he swayed when he walked, which I again assert is not clear in the video, but anything that happened after the two officers grabbed his arms, that it's irrelevant to the reasonable suspicion analysis. So that's the time of the seizure? Exactly, sir. Yes. And so any swaying or... What did they know before they went in there? So the call for service, which the government produced after the court ordered it. There were two calls, right? So there were, but it's not clear in the record that there's two callers. So one of the callers is an officer, but somebody called the officer, Officer Ryder. We don't know who called Officer Ryder, so it's hypothetically possible... An officer adds credibility to it, doesn't it? I don't think so, Your Honor. What do you say? Somebody called Officer Ryder and said X, Y, and Z, but we don't know anything about the credibility of the speaker. I don't know what that has to do with... If an officer is calling... But he's not the witness. He's not the declarant. I understand that, but he's a police officer. Yes. He's a known... It's a fact that he's known as a police officer. He's not an anonymous citizen out there. Sure, but we don't know who called him, and so we don't know anything about the reliability of the person who called Officer Ryder. I'm not questioning anything about Officer Ryder, but what I was saying is... Did Officer Ryder say that someone had called him, so he reported in that somebody told me? Correct. Somebody called him on his cell phone while he was asleep. What we have is, we assume that Officer Ryder was truthful in reporting somebody called him, but what you're saying is he doesn't say anything about the person who called him, but that's only the second call. Right. Correct, and the other thing I would say, first of all, is... Well, I have a couple of things to say, Your Honor. We don't know that the person who called Officer Ryder is not the same person who called 911, so there might be one caller who made two calls. Well, there might be, but let's... It's unclear. I thought we have to look at it in the light most variable of the government. But it's also the government's burden, and they could have listed that fact. But we've got some cases that say that. That's what I said. Correct. But we've got to look at it in the light most favorable of the government. Certainly. So... But looking at it in the light most favorable of the government, there's two callers. So, and in the light most favorable of the government... Is that right? Officer Lipscomb did not know any of the details of the call to Officer Ryder when he went into the bar. All he knew what was in the call for service in the supplemental joint appendix. Officer Ryder... I'm sorry. Who got the call from the bartender, Officer Ryder? Yes. No, no. Yes, that's correct. Did. From a bartender. From a bartender or a bartender? I thought it was the person reporting what the bartender said. Well, and regardless, Your Honors, Officer Lipscomb... A second person called and reported that the bartender was concerned. So, but Officer... We have to go on based on what Officer Lipscomb knew when he seized Mr. Krico? Correct. Officer Lipscomb didn't know any of this. He didn't listen to the 911 calls before the seizure. All he knew is what's in the written call for service. And I thought that was in the written call for service. So, right. And so, they're actually very vague. I mean, again, it's in the supplemental joint appendix. Right. And it just says, check for a WM, I assume that's white man, wearing blue and white striped shirt, has gun on side covered by shirt, subject drinking, not being diso, again, I assume that's disorderly, caller just concerned. That's it. Well, he received a call from... And then there's the second call. Ryder received a call from the bartender at the sports bar. Now, what could the subject of the call have possibly have been other than the fellow whom other patrons of the bar, even though the bartender had not personally observed the gun in the call to Officer Ryder, he said patrons of his had observed the gun in the bar. And why isn't... That interlocks with the call to Officer Lipscomb. Both calls are reporting the same thing, which is that you have a sports bar and the sports bar is serving alcohol. And the bartender in one instance is saying, you know, I have, I've noticed a bulge in the And you made the point in your opening argument, it's clear that you have to, you say you've got to actually be consuming alcohol. But after all, we're dealing in what's a reasonable suspicion or what's reasonably plausible. And this is a sports bar. And one of its primary purposes is to serve alcohol. And how many, how many people go into a sports bar and don't have alcohol of some sort, including a beer? Isn't that a reasonable inference? I think absolutely not, Your Honor, because first of all, we have video in this case. So we don't need to draw inferences because we have a video. And in this case, the video didn't track all of his movements in the bar. Okay, but Mr. Kehoe, the police entered the bar four minutes after the call. And we have a video of exactly what happened. We don't need to draw any inferences at all. Mr. Kehoe is not at the bar. He's in a whole separate room. He's sitting by pool tables. There's tables next to him with no empty glassware, no beers. He's not holding a beverage. There's no alcohol anywhere in sight. So there's no inference to be drawn because there's no alcohol. He's not disorderly. He's not. Everybody agrees. The caller, the bartender and the police all testify or gave information that he was not disorderly. Now, even before the stop, they observed in a sports bar serving alcohol an individual with slurred speech. Sitting next to a billiards table, not at the bar. One of the things here is that Terry v. Ohio was a case in which police, on the basis of reasonable suspicion, could act preventatively and could act proactively. And the crime had not actually been committed in Terry v. Ohio, but the police headed it off. And you are, and it seems to me that the Virginia law here is concerned about the combination of guns and alcohol. That that's a very volatile environment and that it can result easily in a conflagration or loss of life. But hold on a minute. Isn't that exactly the situation in which an officer, if he received two reports like this, would they not have been derelict in their duty? To have just shrugged it off and then they have to live with the consequences when a gunfire breaks out. They went and observed Mr. Kehoe not drinking and behaving in a completely orderly, calm, non-threatening manner. He wasn't complaining. He was leaning over as if to... He leaned towards the police officer to hear him, which is very clear on the video, which is away from the side where the gun was eventually found. Except the district judge indicated that he not, that the speech was slurred and he leaned over. So the district judge made a clearly erroneous finding of fact that he leaned to Mr. Kehoe's right towards the gun, which again, we have a video. That's a clearly erroneous finding. He leaned towards the officer who was speaking to him to hear him because there's very loud music playing, which is audible on the video. And again, you can hear Mr. Kehoe speak on the video, not the entire time, but for part of the time, and his speech is not slurred. And so again, we don't have to draw inferences just from testimony because we have a video. Yes, but we do have findings of fact. And some of them are clearly erroneous, which also, I don't want to not mention the second part of my argument, which is that, and again, we make no allegation that the prosecution did this. What's the rule for you on the basis that the trier of fact in a suppression hearing made a clearly erroneous finding? Yes. You're saying some of the findings, which could be erroneous. Correct. But you were about to get to the second part of your argument. So again, as we mentioned in our reply brief and also in our opening brief, the district judge in this case explicitly relied on the race of my client in contrast to the race of his companions as an explicit factor towards his finding. Because he was a white man in a bar, generally African-American. There were. But the first caller said that the man was inside the bar drinking alcohol while in possession of a concealed firearm. Yes, but so under jail and this court's decision. The second caller said he'd been told by the bartender that the bartender, and that was the police officer. The bartender called the police officer and told him he was worried about an intoxicated white male carrying a firearm at the bar. Correct. Okay. So. Why didn't that take care of? Because under jail. They got in, the tipsters said the fellow's in the bar with a firearm and he's drinking. So under jail and this court's decision in Brown, the police have to corroborate the assertion of illegality once they get there. They did. They investigated it. Hold on. Hold on. You keep saying that there was no evidence this man was consuming alcohol. But the first caller said that other customers were worried about a man who has a gun and is consuming alcohol. So that's the call that has to be corroborated, Your Honor. That's right at the outset. But the second caller corroborated it. But we don't know that those witnesses aren't the same person. But we don't know. And it's the government's burden, Your Honor. We look at it in light most favorable to the government. And then we have video. We know the second one was the police officer who was reporting the call. But the first one said he was at the bar. That's a different person. No, the person who called 911 could have called the provider. At least that's what I'm looking at. The government's brief. Mr. Cook, you're better. I assume you'll stand by. The first call, the confer, whoever that was, could also have called his police officer friend. Correct. And the police officer friend related the second call. But, you know, I think maybe this case is a little closer than maybe some of the questions here look like. But I don't think that this is really an anonymous tip, which is what you try to make it. The first caller gives his name, telephone number. So it doesn't really seem to me it's an important tip. It's not truly anonymous, even though Andre or Andreas, whatever it was, said he wanted to be anonymous. You're right. And we can see that in our opening brief. He does give his name and number. But either way, with respect to the corroboration, the police didn't follow up with him before they stopped Mr. Kehoe. And so in terms of the reliability of it, they never did any of the corroborating things before the time of the seizure. Well, I understand that. But still, the fact that the tipster would give a name and address shows that you have more confidence in it. I agree, Your Honor. But that still doesn't go to the corroboration aspect. These are not anonymous tips. They're not truly anonymous. But they are no more corroborated than an anonymous tip would be. I don't know if it was a cell phone number or a home number. It was a phone number. It was a caller ID to begin with. And people who call 9-1-1 know there's caller ID because there have been instances of many instances of people abusing 9-1-1 calls and chasing the police off on a different thing while they're committing a crime over here. And just to play a practical joke. It's common knowledge that 9-1-1 calls are abuse and that in order to prevent that abuse, they have caller ID. And so you call in. And not only that, he gives his first name. And he gives the contact number. And he states where he is. He says, I'm at RJ's Sports Bar. He says where he is, what his name is, contact number. But, Your Honor, the police still have to corroborate the tip afterwards, which is this court's holding in Brown and J.L. And the bartender did not corroborate the illegality in the tip. That's the crucial thing that never happened and that the government and the police failed to do. I mean, that's this court's holding in Brown and the Supreme Court's holding in J.L. And it just failed to happen here. And we have video evidence of my client not breaking the law. I have a factual question. Yes, ma'am. So you submitted this footage. And I thought the parties have told us that this is Officer Lipscomb's camera. But if you look at the footage, it looks like Officer Lipscomb is in the footage. So I'm glad you asked me that in response because, as you know, I was not trial counsel and neither was Mr. Cook. And so I contacted the trial counsel from the U.S. Attorney's Office when I put together the appendix. And she confirmed, I'll represent this to the court, that this was the video that I should include, that this was the video file that I should include. And so I did. Approximately an hour ago, 10 minutes before I walked in the courtroom, Mr. Cook has now raised a question about this, which I don't have any idea how to answer 10 minutes before court starts. So you think it's not the right video? I don't think that because the trial counsel – Or you think there's another video? The trial counsel from the U.S. Attorney's Office told me that this was the video when I put together the joint appendix. And I have been surprised by this literally 10 minutes before I walked into the courtroom. But there's no claim that it's not a video of this incident. Of course, no. This video is authentic. It's just a question of who's – I mean, do all these folks wear cameras on them? I don't know that, Your Honor. So this is obviously not Lipscomb's video because you can see Officer Lipscomb. It's like, hey, I proved to you that I've watched the video. Thank you, ma'am. So, but, again, the government raised this to me 10 minutes before I walked in the courtroom, so I haven't had a chance to really – Thank you, Your Honor. Mr. Cook? Well, Mr. Cook, what about the video? I'd like to start with the video. Okay. Good place to start. And regrettably, and I apologize – Why don't you move your microphone up? Or is it videos? Yes. So, regrettably, last night, and I apologize that I didn't catch this sooner, that the video that is in the appendix is not the video of Lipscomb. And you can tell that that's true because – Because Mr. Lipscomb is in the video. Is in the video. And so I went back to the record, and I think that a simple mistake was made. I'm not certain exactly how this happened. But when defense counsel introduced – went first, introduced the exhibit of the video, defense counsel referred to it as Officer Lipscomb's body camera video. So the court says, question, did this policeman make this video? Did this officer make this video? Defense counsel responds, yes, Your Honor, that's correct. This is Officer Lipscomb's body cam video that he wore that night. My guess is that that was a mistake. That it wasn't. That's a statement by the lawyer. Right. And then later in the hearing, the government introduced Exhibit 3 and said – had Officer Lipscomb say, yes, there are my initials on that. And we offered it as Lipscomb's body camera. And in my review of the record, we have Exhibit 3 that is Lipscomb's body camera, and you can tell it's him because, unlike the other video, you can't see Lipscomb in it. Who do you think the other one is? The other one is another officer who was right behind. So I don't dispute in any fashion that that video that you have is an authentic video from one of the officers. It just happens not to be Lipscomb. And I also maintain that – It's a video of what was going on in that bar on this occasion. Correct. Correct. And I also think that in terms of visually what happened, it has everything that is relevant to this case in it. But the audio, there is a difference in my view. The court doesn't have the government's Exhibit 3 from Lipscomb, but the audio of Lipscomb, because he's close to the bartender and then he's close to the defendant when speaking, is superior. I think that Government Exhibit 3, because you have the testimony of Lipscomb himself saying, there's my initials on Government Exhibit 3 and we introduced it, that that's in the record. Defense counsel, I think, does not agree. I would suggest that the appropriate way to resolve this is to have the district court make a determination about this. That's what rule 10 is. Yes, and if the court wanted to do that, you could also clean up a point that we agree was error, which is that the defendant does not have the burden of persuasion here. And I think that's harmless, but if the district court needs to sort out this video issue, you may as well clean up that issue as well, which I don't, again, think makes a difference in this case. But we may as well have the correct, completely accurate record, have the fact finder determine exactly what the videos are and rectify this problem. What difference would it make? I don't think it makes a difference. I think the record before the court is sufficient also to rule in the government's favor. And I can pick up where the conversation left off about the call for service reports. And Officer Ryder is not mentioned in the printout for the call for service, but you know that from looking at the video, that he was informed that the bartender had passed along this tip because the first thing he does when he goes in the bar is go to the bartender. Ryder informed Lipscomb. Right. That the bartender had relayed the tip. But when the officers entered the bar, is there any evidence that they knew the second caller was Officer Ryder? I don't see it in the record. But they did know to go to the bartender. They have the first, and then they have this abbreviated second thing. But they don't know the second call is Officer Ryder. I don't think that's established in the record. I would point out also, though, when Master Officer Barnes testified, he testified that he went back immediately after the arrest, and this is Joint Appendix page 109, and spoke with what is obviously Andreas the caller. And Andreas said, no, I don't want to give you any more information about my name. But Barnes knew who to contact and did speak with the person. That's after. That's after. But what it shows is that they were well aware that there was this Andreas person that was reported in the calls for service, and they were well aware that they should talk to the bartender. So they obviously knew that there were these two separate people who were. About talking to the bartender, the other thing I was interested in, where in the record from the suppression hearing, suppression hearing, does it say that the officers asked the bartender whether Mr. Keogh had been drinking? So there isn't anything in the suppression hearing transcript that says that Lipscomb asked the bartender. Or any of the officers did. Right. I think that that is a fact that is in Government's Exhibit 3, but this Court doesn't have that. What is in the record is that what's, I think, why this Court on the existing record can say that the government would win, that they've got evidence that they've been informed that the defendant had been drinking is that. Well, there's a whole bunch of them, but this was one of the sort of, I thought, additional proofs that the government was looking to. And I just don't think that the government knew that, that the officers knew that. There's nothing in this record that says they knew it before they perpetuated the seizure. I would agree that there's no testimony on that point. It would have to come out of the video. The defendant later admitted that in the statement of facts in his guilty plea. Yes, but that's not in the suppression. You're quite right. It's there. Right. But it's not in the suppression hearing. Yeah. I mean, this Court has precedent like Gray and Hahn and the Supreme Court in Carroll that when trial evidence or sentencing evidence supports the findings in the suppression hearing, you can rely on that. But I don't think it's really essential to get into this nitty-gritty because the fact remains. Well, there was a conversation with the bartender when the officers entered the bar. Oh, there definitely was. They didn't just breeze through. No, but they asked where he was. See, they have the blue and white, they have the description. Right. The blue and white guy is there, but I think you're quite correct. There's no evidence that they determined that he'd been drinking. There's no evidence in this record before they make the decision. Right. Again, that would be, in my view, what is in fact Government's Exhibit 3. But I think that what matters here, and that's the actual body cam of Officer Lipscomb because Officer Lipscomb is right next to the bartender, and so he leans forward to talk to the bartender, and that's why the audio is superior. But that's not in the appendix at this point. There's this dispute about it. So what you're saying is that that's necessary to get the translation. But your further point is it's not necessary because you think there's enough here for seizure, and so maybe talk about it. If it's undisputed that the video is a video of the bar. Right. So the thing I keep coming back to is that the first call, what the police, I mean what the Supreme Court and the courts are concerned about are anonymous calls. Right. And to me the interesting thing about this case is I don't think you can call this in any sense an anonymous caller for three different reasons. First of all, it's a 911, which dissipates any anonymity. Second of all, he gives his first name. Third, he gives his contact number. And fourth, he gives the place where he's at, R.J.'s sports bar. So it's pretty far from being an anonymous call. There are four different indicia. That's correct. And in these cases that's what's so important is whether something is anonymous because there's a whole different level of veracity. When you give your name, you use a phone call, you know who has caller ID, and where you identify the place where you are and where the gun was located, and you give your contact number. It's just not, that's the crucial point here. The second call from the bartender to the officer rider is important, but it's not, I mean by itself that wouldn't work. But in combination they do, particularly when the first call, there's no earmarks of anonymity. That's what's important to me. That's right. And as Your Honor said in Christmas, whether the face-to-face tip there was treated as in a superior position because you could follow up with the person. And in this case you know that you could follow up because in fact Officer Barnes did follow up after the incident. So in that sense, it really is clearly not anonymous. Did the first caller say that he was drinking alcohol? He did. And Officer Lipscomb, not only do you have that in the call. The person with the firearm was drinking alcohol. Yes. And so that's not only in the recording of that 911 call. It is also in the call for service report where there's the word intoxicated and it says that subbed drinking and intoxicated individuals. That's in the supplemental appendix. And then Lipscomb testified at the suppression hearing on appendix page 77 that the call for service report said that the subject was drinking. They said that he was intoxicated, I believe, is what was stated. And then Lipscomb also testified that when he went to the defendant, his speech was slightly slurred and then we stood him up to move him outside. So he noticed that the defendant's speech was slurred even before they stood him up and took him out of the bar. And that's at appendix page 85. So both callers said he was intoxicated? Yes. Both of them said he had a firearm? Yes. And under Navarette in the Supreme Court's opinion where they treated a tip as anonymous, they said, well, this is sufficiently reliable even though anonymous because of essentially three factors that they identified. That the person had claimed eyewitness knowledge, and Navarette was the case with the person who was driving dangerously and could be suspected of drunk driving. Someone called into 911 to report that. And they said, well, the anonymous tip that we're treating as anonymous has claimed eyewitness knowledge. Second was it was contemporaneous, which they said was especially reliable. And then the third thing was they said they called into 911, which has a greater reliability to it. And in this case, that's all true. The callers were claiming eyewitness knowledge. They were contemporaneous because the bartender. The second caller wasn't claiming eyewitness knowledge. He was claiming that he had been advised by Navarette. That's true, by the bartender. But the caller was the police officer. Right. Did they know that at the time? No, they didn't know it. They didn't know it when they infatuated the search. Judge Motz, you're right. There's nothing in the call for service that says Ryder and Lipscomb didn't say that he had spoken to Ryder himself. I'm talking about Ryder. Did they know it was the police officer? If they didn't know his name, did they know it was the police officer? I don't believe that that is in the record. Okay, they just know there was a second caller. Right. And they knew to go to the bartender. Okay. So they had clearly gotten the content that it was. There was a second caller who had talked to somebody. Right. At the bar who said he talked to the bartender. Did he know it was the bartender that he had talked to? He must have because he went straight to the bartender. He reported that the bartender was worried. Yes. Your brief said it was the bartender. Yes. Your brief says it's the bartender on page five. Right. He advised dispatch that his friend, and it was a friend of the caller, who was a bartender at RJ's, had called him worried about an intoxicated white male carrying a firearm at the bar. Id. So if that's correct, he knew the fellow that had told him the related information. He knew he was a bartender and that the bartender, who was his friend, told him it was an intoxicated white male, but he didn't know it was the police officer. You have that in the previous sentence, that it was police officer Ryder, but that information wasn't known, right, from the call. It's not in that government exhibit, too, which is the call to service. Right. So what's your position on whether those two calls are enough to do what he did? I think they clearly are enough because they – So all this other stuff is surplusage or conversions or immaterial? Exactly. Exactly. And go back to what's the offense here. The offense here is 18.2-308.012. You don't like the Virginia Code? Right. And you essentially need four things under that statute. You've got to have a person with the handgun. It's got to be concealed. The person has to be consuming alcohol. And that's the difference with the subsection B of that statute, is that if you don't have – the difference between A and B of that statute is, A, is if you were intoxicated in a public place, then even if you have the concealed permit, you can't have the gun. B is if you were in a restaurant bar here, then simply drinking is enough, even if you have a concealed permit, which, of course, this defendant didn't, but the police officer didn't know when they entered the bar that the guy didn't have the permit. And so all we need to establish under B is that he's got a gun, it's concealed. The tip's easily provided that, and that was all confirmed by their observation that they didn't see the gun when they approached the defendant. And so then you really need just that he's consuming alcohol. And the tip says that the call for service report says the subject was drinking and that he was intoxicated. And Lipscomb testified in testimony that's credited on appendix page 77 that he was aware of that information from the call for service report. Okay. So the call for service, what do you say says he was intoxicated? I'm looking at your call for service thing. It doesn't say that, says he's been drinking. It does. It's not the easiest to read, and I'll point you to it, Your Honor. Let me get real quickly to it. Okay, so if you. We're looking. Are we in the supplemental appendix? Yes. So if you look at the second line of the first sentence in all caps, it's got SUBJ drinking. Right. And then if you go down and look over in the right in the next paragraph in all caps, individuals, yes. And then I realize that's a little cryptic, but if you go to Lipscomb's testimony on page 77 of the appendix, he says that he was aware of those facts. On the other, it doesn't really matter whether he's intoxicated or not. Right, right. You don't have to go that far. It's enough that he's drinking. And what testimony, again, was there that when he arrived at the bar, the patron was, you say, it only needs to be drinking. Right. And what evidence was there that he was drinking when he arrived at the bar, when Lipscomb arrived at the bar? So there's that tip that the call for service report that refers to the drinking that Officer Lipscomb testified that he knew. The first one or second one? Both of them. Both of them. Yeah. And this is, as you said, taking the inference that you can read that call for service as having two reports in it, which I think is a fair inference. I mean, and you do keep emphasizing that, but even if it was one. That's sufficient, yes. So you don't have to make that inference. You can rely on the fact that one is enough, and this guy was there was sufficient indicia of the reliability of even that one tip. And then you have the testimony from Lipscomb that when he approached the defendant, his speech was slightly slurred. And there's also your honor's point, Judge Wilkinson, that this is a bar after midnight. I mean, it's some corroboration that people in a bar after midnight could be drinking. So in conjunction with the other evidence, you don't have to infer that the police. All the cases say you can draw a reasonable common sense inferences. Right. And based on your experience, one of the things that troubles me is there have been an awful lot of incidents, large incidents at Orlando and other places where patrons of a bar and abroad, too, where patrons of a bar have met unfortunate fates. But there have also been many individual instances, probably far more numerous, where tempers flare or somebody perceives an insult or somebody perceives that they've been slighted in some way or that someone makes off with someone else's date. There are a whole lot of things that can happen. And the combination of guns in a place where people are there to be consuming alcohol, particularly at this hour, you want the police to act proactively if they have this kind of information. In order to head off something that could be far more tragic, I mean, you can get people who lose their lives in this kind of thing because people don't have, their judgment is eroded at this hour of the night, but more particularly when people around, including themselves, are drinking and they have a gun at their disposal. And their inhibitions are lessened. And their judgment is affected. And bad things happen. Can I ask you, I just want to be sure I understood, that you agree that the seizure occurred at the time the officers directed the keel to leave the bar? One small qualification on that, Your Honor. So when they grab him and take him out of the bar, yes. Initially, they are asking him, can we talk to you? And he's not agreeing to move outside because they can't hear. At that point, I think you can say two things. First of all, to the extent you were to read that as an order to go outside, he doesn't comply. And so until he actually complies. No, I'm talking about sort of. Yeah, once they're moving him out of the bar, yes. But he doesn't get. So, and I don't know that the parsing exactly when that occurs matters so much because I don't know that you get a ton of additional information in that phase. I mean, they approach him. The testimony from officer Lipscomb is that you can tell that the guy's got slurred speech. And if you look at the video before, I think that there's contact with the defendant at two minutes and six seconds. He stands up at three minutes and 36 seconds. And they touch him and lead him outside at four minutes and 32 seconds. So, there is a period of time where they're interacting with the guy that I don't think you could say that there was a seizure. But as they're escorting him out of the bar, there's clearly a seizure at that point. I wouldn't contest that. I see my red light is on. There was one point I wanted to make about Judge Wilkinson's final comment, if I may, which is the danger of the drinking. And there was a question asked of Lipscomb about why he didn't go to the 911 caller first and entering the bar. And he said, you know, my initial thought was the defendant had a firearm and I wanted to establish that. And then I would go and investigate the patrons, which is a reflection of this is dangerous. And they wanted to neutralize the drunk guy with the gun before they did a whole lot more. And that's it. Appendix page 68. Thank you, Your Honors. Ms. Plyer, do you have some rebuttal time? We'd be pleased to hear from you. Thank you, Your Honors. So not to quibble too much, but with regard to the call to service report where it says the word intoxicated, that appears to be like a category that is put in by the dispatcher, not what the caller said, which does say subject drinking, of course. The, I believe my colleague mistakenly just said that the police themselves saw the bulge or the gun on Mr. Kehoe, which I believe is undisputed. They did not. The bartender said that he had seen it. The police testified clearly that they did not. I think he just misspoke. I'd like to spend a couple of minutes talking about Judge Dumar's sort of inexplicable comments about Mr. Kehoe's race. The first caller said that the other customers were worried about a man who had a gun. So all the customers had seen the gun. Yes. So Judge Dumar in multiple places in the record referred to Mr. Kehoe's race in comparison to the black people who were surrounding him in the pool hall. And he did so in a way that was not to identify who was the subject of these 911 calls. It is very clear to the police and to the council and to everybody involved, there was only one person that was the subject of these calls. That's error. It's error. So what standard do we use to review that? I mean it's a constitutional error, Your Honor. It's a legal question. I know, but does it require reversal? I think it does, Your Honor. Why? Because. That doesn't change the facts, what led up to all that. That's true, Your Honor, but I think. We don't give any deference. We're reviewing the no vote anyway. Your Honor, it was amazing to me actually how hard it was to find a case in which a judge actually said, I find your client's race suspicious because you can't do that. As your honors are acknowledging. And so in all of the cases that I found, which I cited, the evidence was suppressed. That's the remedy. And the standard is because it's unconstitutional and it's so unconstitutional, I would argue that it's akin to a structural error. There is nothing that is more damaging in the United States of America than the use of race in a criminal suspicion. And so I don't think that there's anything that could ever make that harmless because it damages the integrity of the judicial proceeding, to borrow a phrase from a different legal standard, in a way that is inexcusable. And again, we do not allege that the government had anything to do with this. It was just. That may be true, but the question really before us is whether there was, objectively speaking, whether there was reasonable suspicion. And there either was or there wasn't. And that, it seems to me, is what this, the thing bottoms out on. It's just, it was wrong to have said it, but I don't think it affects the fundamental question of whether there's reasonable suspicion. So, Your Honor, that's my first claim, but it affected Judge Dumar's judgment. And that's, I don't think that it could ever be a harmless error. I just don't. So what's the best case you have? I just, I just don't, I don't. I think it's akin to a structural error, Your Honor. I think that, especially because as you indicated, this is a close case on reasonable suspicion in either event, particularly given the lack of evidence of corroboration of the consumption of alcohol portion of the alleged criminal behavior. This is, at best for the government, a close case on reasonable suspicion. It's not a slam dunk. If you had video of him drinking shots of Jack Daniels in that pool room, I think that's the harder case for me. But we don't have that. We do not have the corroboration of the drinking. And so, because I think it's a close case on reasonable suspicion, I think these things tie together. And I don't think that using race as a criminal factor can ever be harmless error. I don't know how to say it more clearly than that. So help me. In your submission, I know that the district judge relied on race in concluding. Yes, ma'am. So there's a quote. But race in that it distinguished the defendant. I think it was more than that, Your Honor. I mean, that's certainly part of what he did. But there are places where the district judge actually says the race of the defendant goes towards the reasonable suspicion. It's not just that he's different from the people around him. But race is often used as an identifier in the dispatch call. Sure. If you want to talk about the white lady in the gray suit, I have no problem with that. Well, why not? Because it's.  Well done, ma'am. You're right. I apologize. Your Honor, that was that was probably going to be. But I mean, if you want to talk about the person in the gray suit or the person with the brown hair, I mean, they're there. But but what Judge Schumer said is, I don't see anything to this myself that would cause me to believe they didn't have reasonable suspicion of criminal activity. You know, we can't stop an incident like occurred in South Carolina unless we wait until they shoot them. And then he said, there's callers about a man having a gun. They say it's a white man after midnight. And I'm looking at these pictures and there are no other white men there. I mean, you guys, excuse me for being casual. I mean, it's clear that Judge Dumar did not just use this to identify who is the white man in the white striped shirt. And so, again, this is not a harmless error. That's it. That sort of assumes the worst. And that the point is, and whether it be a dispatching call or a call from the police or whether it be a call from as it was here, along with clothing and everything else, it could state a simple fact as an identifier without implying prejudice in any way. And that's what the 911 caller did, Your Honor. I have no argument with that. I find it hard to think that any district judge in this circuit would be a prejudiced person and relying on race one way or another. I'm not alleging prejudice, Your Honor. I'm alleging that he used an unconstitutional factor in his legal analysis, which is a different thing to say. And I want to be careful. I just would urge the court again to look at the joint appendix at pages 79, 112, 116, 118, 119. The fact that this was an illegal factor is clear on the record. What's your best case for us saying that we're urging this to reverse on that basis? I think that the best case, Your Honor, is that in an otherwise close case where, given the contents of the calls and all of the allegations of criminality, they were largely uncorroborated by the video, by the police, by the bartender, when the police got to the bar. And so because it's a close case. Yes, but I'm asking you about a case like third. So, yeah, I cited a couple of cases in my reply brief. I'm happy to look at the cites for you, where Fourth Amendment evidence was suppressed because district judges relied on the race of the suspect in reasonable suspicion analysis, and the remedy was suppression of the evidence. Thank you. And it's tied to the reasonable suspicion analysis. Well. I don't want to overstate what I'm saying. Right. So for all of the factors, largely due to lack of corroboration and also. If this is the argument, one of the things that I don't understand is why people bring up first things. These sorts of things in the rebuttal argument. You tried to bring it up. Thank you, Your Honor. I did, but my time seemed to run by very quickly. So I appreciate if the court has no further questions, we would ask the court to reverse the decision. You'll come down and greet counsel, and then we'll take a brief recess. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Robert B. King